Amy Edgy
Robert H. Trust
Christopher J. Hunker
**LINKLATERS LLP**
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9000 (Tel)
(212) 903-9100 (Fax)

*Counsel to the Foreign Representative*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

*In re*

Lehman Brothers International (Europe) (in administration),[1]

Debtor in a Foreign Proceeding.

</td><td>

Chapter 15

Case No. 18-11470 (SCC)

</td></tr>
</table>

## DECLARATION OF RUSSELL DOWNS
## IN SUPPORT OF VERIFIED CHAPTER 15 PETITION AND RELATED RELIEF

I, Russell Downs, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

1.    I serve as one of the joint administrators (the "Administrators")[2] of Lehman Brothers International (Europe) (in administration) (the "Debtor"), which entered administration in the U.K. on September 15, 2008 (the "Administration"). I have served as an Administrator of the Debtor since November 2, 2011 pursuant to an order of the High Court of

---

[1]    The last four digits of the Debtor's England and Wales company registration number are 8254. The location of the Debtor's registered office is Level 23, 25 Canada Square, London E14 5LQ, United Kingdom.

[2]    The other Administrators are Anthony Victor Lomas, Steven Anthony Pearson and Julian Guy Parr, who were appointed to serve as Administrators pursuant to orders of the High Court dated September 15, 2008, November 2, 2011 and March 22, 2013, respectively. Most recently, Lomas and I have been the Administrators typically with the greatest involvement in the key decisions made with respect to the Debtor, while Pearson and Parr have more limited day-to-day responsibilities.

England and Wales (the "High Court").  I am a licensed insolvency practitioner with over 25 years of experience and a partner at PricewaterhouseCoopers LLP ("PwC"), a professional services firm, in PwC's office located at 7 More London Riverside, SE1 2RT, London, England.

2.      In my capacity as an Administrator, I am responsible for, among other things, overseeing the distribution of the Debtor's assets to its creditors.  In this capacity, I have been extensively involved in the settlement negotiations that have culminated in, among other things, the scheme of arrangement (the "Scheme") that is currently pending in proceedings before the High Court (the "English Proceeding").[3]  I have detailed knowledge of, and experience with, the Debtor's affairs and its creditors.

3.      On May 2, 2018, the Debtor filed an application under part 26 of the Companies Act 2006 of England and Wales commencing the English Proceeding and requesting that the High Court approve the Debtor's request to convene meetings (the "Scheme Meetings") of the Debtor's creditors (the "Scheme Creditors")[4] for the purpose of obtaining the requisite votes in favor of the Scheme.  On May 9 and 10, 2018, the High Court held the Convening Hearing and entered an order (the "Convening Order") dated May 11, 2018 authorizing the Debtor to convene the Scheme Meetings on June 5, 2018.   The Convening Order approved my appointment as the "foreign representative" as defined in section 101(24) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and authorized me to seek chapter 15 recognition of the English Proceeding.  Pursuant to that authority, today (the "Petition Date"), the Debtor commenced this chapter 15 case (the "Chapter 15 Case") by filing

---

[3]   The term "English Proceeding" describes only the Scheme and not the Administration, which is a separate proceeding under English insolvency law.

[4]   The Scheme Creditors include any creditor that could prove its claims in the Administration (the "Provable Claims"), regardless of whether such claim is (i) an admitted claim (collectively, the "Admitted Claims"), (ii) awaiting adjudication by the Administrators, (iii) rejected by the Administrators but is subject to appeal or within the time limited to be appealed or (iv) yet to be proven in the Administration.

a petition seeking recognition of the English Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

4.      I submit this declaration in support of the *Verified Petition Under Chapter 15 For Recognition Of A Foreign Main Proceeding and Related Relief* (the "Verified Petition" and together with the Form of Voluntary Petition [Dkt. No. 1], the "Petition")[5] to provide an overview of the Debtor and the Scheme.  I have reviewed the Petition, and it is my belief that the relief sought therein is necessary to implement the settlement described herein.

5.      Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Debtor, or my opinion based upon experience, knowledge, and information concerning the Debtor.  I am authorized to submit this declaration on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

6.      Section I of this declaration describes the Debtor and the Administration.  Section II describes events leading up to the Scheme, including a description of the various litigations and claims that are being settled in the Scheme.   Section III describes the origins and development of the Scheme.  Section IV provides an overview of the Scheme, including a description of the key elements of the Scheme.  Section V provides specific information about the Debtor's headquarters and connections to the United States.  Finally, section VI describes the need for chapter 15 relief.

---

[5]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

## I.    Introduction to the Debtor and the Administration

### A.    The Debtor

7.    Prior to the commencement of the Administration on September 15, 2008, the Debtor was the principal trading company in Europe within the Lehman Brothers' group of entities (the "Lehman Group"), of which Lehman Brothers Holdings, Inc. ("LBHI") was the ultimate parent.  The Lehman Group provided investment banking services to clients (including corporate customers, institutions, governments, hedge funds and private clients) on a global basis.  The Lehman Group was headquartered in New York with regional headquarters in London and Tokyo and many regional offices in North America, Europe, the Middle East, Latin America and the Asia-Pacific region.  Until its collapse, the Lehman Group was among the largest investment banks in the United States.

8.    Investment banking was at the core of the Lehman Group's business.  It operated in a market that depended heavily on investor and market confidence.  In the period immediately prior to the Administration, there was an escalating loss of confidence in the Lehman Group, as evidenced by a significant deterioration in LBHI's share price on the New York Stock Exchange of almost 80% during the week from September 5, 2008 to September 12, 2008.  On September 9, 2008 alone, LBHI's share price fell 45% following reports that negotiations with the Korean Development Bank regarding a potential major investment in the Lehman Group had been suspended.  The following day, the Lehman Group announced a third quarter loss of $3.9 billion.  Simultaneously, the Lehman Group announced plans to sell a majority stake in its investment management business and to spin off the majority of its commercial real estate assets into a new, separate public company.  These measures failed to restore investor confidence, and LBHI's share price fell a further 7% on September 10, 2008.

Following the close of business that day, Moody's Investor Service announced that it intended to downgrade the Lehman Group's credit rating in the absence of a purchase of the Lehman Group.

9.    The Lehman Group took various steps in an attempt to resolve the Lehman Group's dire situation, including holding discussions in New York with potential investors in, and purchasers of, the Lehman Group's businesses (or parts thereof). At the same time, the Administrators' firm, PwC, met with the Debtor's directors to consider steps that should be taken if the Lehman Group's efforts to save itself were unsuccessful. Because LBHI centrally managed substantially all of the Lehman Group's cash, a failure of LBHI to settle obligations on behalf of the Debtor would cause the Debtor to be unable to meet its obligations as they became due. Accordingly, on September 14, 2008, the Debtor's directors sought LBHI's assurances that payments to be made by LBHI on behalf of the Debtor would be made. At approximately 12:30 a.m. (London time) on September 15, 2008, LBHI informed the Debtor that LBHI would no longer make payments to or for the Debtor or on behalf of any other Lehman Group entity and that LBHI was preparing to file a petition for relief under chapter 11 of the Bankruptcy Code. Overnight, preparations were made by the directors, employees and advisors of a number of Lehman Group companies in the United Kingdom (including the Debtor) for those companies to seek the protection of an administration order on the basis that those Lehman Group companies would be unable to meet their debts as they became due.

**B.    The Administration and Interim Distributions**

10.    At 7:56 a.m. (London time) on September 15, 2008, upon an application filed by the Debtor's directors, the Debtor was placed into the Administration under the supervision of the High Court. The original administrators (Anthony Victor Lomas, Steven Anthony Pearson,

Dan Yoram Schwarzmann and Michael Andrew Jervis) were appointed pursuant to an order of the High Court (the "Administration Order"). Those original administrators immediately assumed responsibility for the Debtor's affairs and began the process of liquidating assets, reconciling claims and making distributions to creditors as well as managing client money and returning it to the rightful owners.

11.     On December 2, 2009, the Administrators obtained an order from the High Court permitting distributions to be made to unsecured creditors. Following entry of that order, the Administrators notified all parties they believed may have had a pre-Administration relationship with the Debtor that they needed to file proofs of debt against the Debtor no later than December 31, 2010, which was subsequently extended to December 31, 2012. The Administrators then undertook an extensive claims reconciliation process to determine the quantum of claims against the Debtor. Beginning in November 2012,[6] the Administrators made distributions to creditors in the aggregate amount of approximately £12.6 billion, repaying the principal amount of all Admitted Claims against the Debtor.

## II.    Events Leading to the Development of the Scheme

12.     Around the time that interim distributions began, the Administrators determined that the Debtor might have a surplus sufficient to enable a payment to creditors in respect of their statutory interest entitlements (the "Surplus").[7] The Administrators estimate that the currently available Surplus is approximately £6.070 billion (after establishing adequate reserves for higher ranking claims). In recognition of the potential Surplus, the Administrators

---

[6]   The four interim distributions were made on November 26, 2012, June 19, 2013, June 28, 2013 and November 21, 2013.

[7]   The Surplus is the amount of cash and other assets in excess of the amount required to repay in full the principal amount of the Admitted Claims, expenses of the Administration and all preferential debts.

commenced proceedings to determine certain issues relating to creditors' entitlements to the Surplus (the "Waterfall I Proceedings").  Further proceedings were subsequently commenced to determine additional questions related to such entitlements (the "Waterfall II Proceedings" and the "Waterfall III Proceedings," and together with the Waterfall I Proceedings, collectively, the "Waterfall Proceedings").  As of the date hereof, the Waterfall I Proceedings and the Waterfall III Proceedings have concluded.  The Waterfall II Proceedings consist of several parts (referred to as Tranche A, Tranche B, and Tranche C), only one of which (Tranche B) has concluded.  The Tranche A and Tranche C parts of the Waterfall II Proceedings remain pending.  The Administrators have been advised that the Waterfall II Proceedings will remain pending until at least 2020 if that litigation is not settled as contemplated by the Scheme.  As described more fully below, the Scheme implements a settlement of the pending litigation that will provide a swift conclusion to those proceedings and enable the Administrators to distribute the Surplus quickly and efficiently to Scheme Creditors.

**A.      The Waterfall I Proceedings Have Concluded**

13.      The Administrators commenced the Waterfall I Proceedings in February 2013 to resolve issues relating to, among other things, (i) the ranking and payment of subordinated liabilities arising under certain intercompany loan agreements between the Debtor and LB Holdings Intermediate 2 Limited (in administration) ("LBHI2"), which LBHI2 assigned to Wentworth Sons Sub-Debt S.a.r.l. (the "Subordinated Creditor") in January 2014 (the "Subordinated Debt") and (ii) the impact of a liquidation on claims to statutory interest under applicable English insolvency law ("Statutory Interest") as a result of the Surplus.  The Waterfall I Proceedings were litigated in the High Court and were appealed to the Court of

Appeal of England and Wales (the "Court of Appeal") and the Supreme Court of the United

Kingdom (the "Supreme Court") (collectively, the "English Courts").

14.     In 2014, the High Court held that (a) the Subordinated Debt ranked behind (i) all

creditors that hold Provable Claims, (ii) any claims to Statutory Interest and (iii) claims that are

not provable in the Administration, but that are payable in the Administration after payment of

Statutory Interest (the "Non-Provable Claims") and (b) those senior liabilities would have to be

paid in full before the Subordinated Creditor could submit a proof of debt for the Subordinated

Debt.  Following an appeal to the Court of Appeal (which overturned certain of the High Court's

findings), in May 2017, the Supreme Court affirmed the High Court's ruling.  The Supreme

Court also affirmed the High Court's ruling that, if the Debtor moved from administration into

liquidation, any claim to Statutory Interest that had become payable during the Administration

(as a result of the Surplus) but had not been paid prior to the commencement of the liquidation

could not subsequently be paid or proved in the liquidation.  Following the Supreme Court's

ruling, the Waterfall I Proceedings concluded, and no further rights of appeal exist.  As such,

the Scheme does not settle any of the issues that arose in the Waterfall I Proceedings.  The

Scheme is consistent with the English Courts' rulings in the Waterfall I Proceedings.

**B.      The Waterfall II Proceedings**

15.     The Administrators commenced the Waterfall II Proceedings in June 2014.  As

noted above, those proceedings fall into three "tranches" of issues, of which Tranche A and

Tranche C remain pending.

*i.      Tranche A Remains Pending*

16.     The Tranche A proceedings primarily deal with the issues regarding the

calculation of Statutory Interest to be paid from the Surplus and seeks further guidance as to

the proper distribution of the Surplus. The issues raised in the Tranche A proceedings include, among other things, (i) how distributions paid in the Administration are to be applied in respect of debts proved against the Debtor, (ii) where the relevant interest rate to be applied is a compounding rate, whether Statutory Interest continues to accrue following the payment in full of the principal amount of a creditor's Provable Claim and (iii) the date from which Statutory Interest on admitted future and contingent claims is calculated. In 2015, the High Court held that (i) distributions to a creditor in the Administration are applied first to the principal amount of the creditor's Provable Claim, (ii) Statutory Interest does not continue to compound following the payment of the principal amount of the Provable Claim and (iii) Statutory Interest is calculated from the date of the Administration. In October 2017, the Court of Appeal upheld the High Court's ruling.

17. Certain creditors have filed an application to appeal the Court of Appeal's decision to the Supreme Court. The Court of Appeal denied the application for permission to appeal to the Supreme Court. Following the Court of Appeal's denial of the request for permission to appeal, those creditors made an application for permission to appeal directly to the Supreme Court. That application now is pending before the Supreme Court itself. Following agreement on the settlement of the outstanding issues in the Tranche A proceedings to be implemented through the Scheme and execution of the Lock-Up Agreement (as defined below), the Supreme Court granted the parties' request to defer its decision on the application for permission to appeal pending implementation of the Scheme. If the Scheme becomes effective, the applications for permission to appeal will be withdrawn. If the Scheme does not become effective, the Supreme Court will decide those applications.

### ii.      *Tranche B Has Been Settled*

18.      The Tranche B proceedings deal with the construction and effect of release clauses in various agreements made between the Debtor and a large number of its creditors in respect of their Admitted Claims after the commencement of the Administration, including whether the releases in those agreements precluded creditors from asserting certain Non-Provable Claims that otherwise carry a right to claim an entitlement against the Surplus.  The High Court issued a ruling on the Tranche B issues, which was appealed to the Court of Appeal.  However, that appeal was rendered moot following the Supreme Court's decision in the Waterfall I Proceedings, and no parties are pursuing any of the Tranche B issues.  Accordingly, the Tranche B proceedings have concluded, and the Scheme has no effect on the issues raised in the Tranche B proceedings.

### iii.     *Tranche C Remains Pending*

19.      The Tranche C proceedings deal with, among other things, the construction of English and New York law ISDA Master Agreements (as defined in the Scheme), which may give rise to an entitlement to Statutory Interest on debts owed by the Debtor at an annual rate of higher than 8% per annum.  The High Court was asked to interpret the definition of "Default Rate" under the ISDA Master Agreements, which is defined as the "*rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.*"  The High Court held, among other things, that (i) the relevant payee for purposes of the certification was the original counterparty to the ISDA Master Agreement, not an assignee, (ii) the cost of funding does not include the cost of equity funding and (iii) a certification was conclusive unless it was made

irrationally or in bad faith, contained a manifest error or did not comply with the High Court's findings on the "cost of funding" issue.

20.     Certain parties to the Tranche C proceedings appealed the High Court's holding that the "Default Rate" provisions of the ISDA Master Agreements referring to the parties' "cost of funding" do not include cost of equity funding.[8]   The Court of Appeal is scheduled to hear that appeal in July 2018.   The Scheme provides for a full and final settlement of the Tranche C proceedings in a manner consistent with the High Court's rulings on these issues. Therefore, if the Scheme becomes effective, the appeal will be withdrawn.   If the Scheme does not become effective, the Court of Appeal hearing in respect of the appeal of the Tranche C proceedings will proceed.

## C.     The Waterfall III Proceedings Have Been Settled

21.     The Administrators commenced the Waterfall III Proceedings in April 2016 to resolve issues relating to certain contributory claims and other affiliate issues, including, among other things, (i) the scope of contribution claims that the Debtor might make against LBHI2 and Lehman Brothers Limited (in administration) ("LBL"), as shareholders of the Debtor,[9] (ii) the set-off rights of the Debtor, LBL and LBHI2 against each other, (iii) the claims of LBL and LBHI2 against each other with respect to any contribution they are required to make to the Debtor, (iv) the existence of LBL's claim against the Debtor and other members of the Lehman Group to recharge certain liabilities against them and (v) whether LBL was the Debtor's shareholder such that it is liable for contribution claims.   The Waterfall III Proceedings were

---

[8]   That appeal does not challenge the High Court's ruling regarding the identity of the relevant payee and the grounds for challenging a certification.

[9]   LBHI2 is now the sole shareholder of the Debtor.   LBL previously held a single share in the Debtor, but that share was transferred to LBHI2 in 2017.

divided into two parts – Part A, which concerned legal issues and was heard at a trial commencing in January 2017, and Part B, which concerned factual issues and was scheduled to be heard at a trial commencing in September 2017.

22.    Following the conclusion of the Part A trial (but before the High Court issued its ruling on the Part A issues and held the Part B trial), the parties reached a settlement of the Waterfall III Proceedings.  The settlement was approved by the High Court in August 2017 and became effective in September 2017.  The Waterfall III Proceedings were subsequently dismissed pursuant to a December 2017 order of the High Court.  Given the dismissal, the Scheme has no effect on the Waterfall III Proceedings.

**D.    The Lacuna Application Remains Pending**

23.    The Lacuna Application (as defined below) arose out of the Supreme Court's determination in May 2017 that any unpaid Statutory Interest arising in the Administration cannot constitute a claim or be paid in a subsequent liquidation.  The impact of this finding was that, upon commencement of a liquidation, any sums that would otherwise be payable as Statutory Interest in the Administration would instead flow down to the Subordinated Creditor, and depending on the amount of such sums, to the Debtor's shareholder.  In October 2017, the Subordinated Creditor sent a written request to the Administrators to seek a creditors' decision on whether to terminate the Administration and commence a liquidation under applicable English insolvency law.  In response, the Administrators filed an application (the "Lacuna Application") seeking directions from the High Court in respect of (i) the Administrators' obligations to comply with the request and (ii) the Subordinated Creditor's ability to make the request or take other steps to initiate the liquidation of the Debtor.

24.    In January 2018, the High Court granted a request by the Administrators and the

Subordinated Creditor to stay the proceedings regarding the Lacuna Application pending implementation of the Scheme, which provides for a full and final settlement of the Lacuna Application. If the Scheme becomes effective, the Lacuna Application will be dismissed. If the Scheme does not become effective, the parties will apply to lift the stay of the proceedings with respect to the Lacuna Application.

### E.    The Olivant Application Remains Pending

25.    In addition to the three Waterfall Proceedings and the Lacuna Application, the Administrators also have a pending application commenced by the Subordinated Creditor on the issue of the Administrators' decision to admit the largest ordinary unsecured claim in the Administration. On September 19, 2017, the Subordinated Creditor filed an application (the "Olivant Application") seeking to reverse or modify the Administrators' decision to admit a proof of debt submitted by Olivant Investment Switzerland S.A. ("Olivant") for an agreed amount of £555,250,000. Olivant had originally submitted a proof of debt in the amount of over £800 million. However, the £555,250,000 amount was agreed between Olivant and the Debtor through a claims negotiation process (the "Claim Determination").

26.    There are several open issues related to the Olivant Application. One of these issues is whether a third-party, such as the Subordinated Creditor, may challenge a creditor's claim, like Olivant's claim, that has been agreed upon by the Debtor and the relevant creditor through the Claim Determination. Following a preliminary case management hearing, the High Court scheduled a trial on certain preliminary issues in June 2018, with the remainder of the issues addressed at a hearing to be held in 2019.

27.    In January 2018, the High Court granted a request by the Administrators and the Subordinated Creditor to stay the proceedings regarding the Olivant Application, pending

implementation of the Scheme, which provides for a full and final settlement of the Olivant Application.  If the Scheme becomes effective, the Olivant Application will be dismissed.  If the Scheme does not become effective, the parties will apply to lift the stay of the proceedings with respect to the Olivant Application.  The Scheme includes a provision that will prevent Scheme Creditors from challenging claims of other creditors which have been admitted prior to a specified date, including Olivant's claim.  This provision will provide certainty with respect to the amount of Admitted Claims, which will enable the Administrators to calculate the total amount of Statutory Interest liability and make distributions of the Surplus on the basis of that calculation.

### III.    Origins and Development of the Scheme

28.    As noted above, if the Waterfall II Proceedings, the Lacuna Application and the Olivant Application were litigated to conclusion, it is likely that those proceedings would not end until 2020 at the earliest, resulting in significant additional costs and further delay in making distributions of the Surplus to Scheme Creditors.  Accordingly, the Administrators determined in late 2017 to engage in negotiations with the Debtor's largest creditors, including the "Senior Creditors Group" (the "SCG")[10] and the "Wentworth Group"[11] in an effort to reach a consensual resolution regarding creditors' entitlement to the Surplus.  The SCG and the Subordinated Creditor are the principal participants (together with York Global Finance BDH LLC and Goldman Sachs International) in the Waterfall II Proceedings, and certain members of the Wentworth Group are party to the Olivant Application and the Lacuna Application.

---

[10]  The SCG consists of a number of creditors holding Admitted Claims ranking *pari passu* with the other ordinary unsecured claims.

[11]  The Wentworth Group consists of (i) holders of Admitted Claims that rank *pari passu* with all other ordinary unsecured claims and (ii) the Subordinated Creditor, whose Subordinated Debt claim is valued at £1.24 billion (excluding interest).

29.     Following extensive arm's-length negotiations, the Administrators successfully reached an agreement with the SCG and the Wentworth Group on the terms of a consensual settlement of the issues related to creditors' entitlements to the Surplus.  Those terms were memorialized in a term sheet that was attached to the Lock-Up Agreement dated December 22, 2017 (the "Lock-Up Agreement") by and among the Debtor, the SCG and the Wentworth Group.  Under the Lock-Up Agreement, the parties agreed to support the implementation of the settlement through the Scheme, including agreeing to stay the Tranche A Waterfall II Proceedings, the Lacuna Application and the Olivant Application.  Although the Tranche C Waterfall II Proceedings are not stayed, the next hearing is scheduled for July 2018, by which time it is anticipated that the Scheme will be approved and effective.  The Lock-Up Agreement terminates on June 30, 2018 (or such later date as may be agreed in writing between the original parties to the Lock-Up Agreement).  The Wentworth Group and the SCG are not entitled to any fee, payment (other than payments made under the terms of the Scheme) or other inducements from the Debtor in exchange for executing the Lock-Up Agreement and supporting the Scheme, but the SCG is receiving a payment from the Wentworth Group as described in paragraph 32 below.

30.     The SCG and the Wentworth Group together hold approximately 78% by value of all Admitted Claims.  The SCG collectively holds or controls approximately 40% by value of all Admitted Claims, and the Wentworth Group holds or controls approximately 38% by value of all Admitted Claims.  Accordingly, each of the SCG and the Wentworth Group is in a position to block any attempted consensual resolution.

IV.      **Overview and Key Elements of the Scheme**

31.      With the support of an overwhelming majority of holders of Admitted Claims, the Debtor filed the Scheme to implement the agreed settlement that will swiftly end the ongoing litigation and permit the Administrators to calculate the amount of Statutory Interest in respect of Admitted Claims and make distributions of the Surplus without further cost or delay.

A.      **Practice Statement Letter**

32.      The Administrators issued the Practice Statement Letter dated April 18, 2018 (the "PSL"), which was distributed to all persons who the Administrators believe are Scheme Creditors for the purposes of notifying those parties of (i) the Administrators' decision to cause the Debtor to propose the Scheme, (ii) the objectives the Scheme is designed to achieve and (iii) the composition of the Scheme Meetings that the Debtor intends to convene, subject to High Court approval, for Scheme Creditors to vote on the Scheme.  On May 2, 2018, the Debtor issued an update to the PSL.  The update informed Scheme Creditors that the Subordinated Creditor, certain other members of the Wentworth Group and certain of the SCG creditors had entered into a separate settlement agreement in parallel with the Lock-Up Agreement which provided, among other things, that some of the entities that make up the SCG would receive from those Wentworth Group parties a £35 million "consent fee" in the event that the Scheme becomes effective (the "Arrangement").[12]  In light of the Arrangement, the Administrators determined that the SCG will be classified in a separate fourth class of creditors and vote at a separate Scheme Meeting from other Scheme Creditors.

---

[12] The Administrators first became aware of the Arrangement on April 25, 2018 and received a copy of the agreement implementing the Arrangement on April 29, 2018.

**B.**     **Purpose of the Scheme**

33.     The primary purpose of the Scheme is to facilitate an expedited payment to Scheme Creditors in respect of their entitlements to Statutory Interest by (i) bringing an end to the Waterfall II Proceedings, the Lacuna Application and the Olivant Application, (ii) barring challenges by Scheme Creditors to the validity or amount of any Admitted Claim admitted prior to a specified date, (iii) providing a Certification Option (as defined below) to determine the amount of a Higher Rate Claim in respect of the ISDA Master Agreements (and certain other contracts with similar features) and a dispute resolution procedure to adjudicate any issues arising from such certification, (iv) releasing the Debtor from any further claims by Scheme Creditors by establishing a bar date (the "Bar Date")[13] for asserting claims against the Debtor and (v) providing a framework to make payments to creditors on their Statutory Interest claims.

**C.**     **Scheme Creditors and Scheme Parties**

34.     In addition to the Scheme Creditors, the Scheme is binding on Storm Funding Limited (collectively, with the Scheme Creditors, the "Scheme Parties").   LBHI2 has also agreed to enter into an undertaking pursuant to which it will consent to the Scheme and, on and after the Effective Date, will undertake certain obligations in connection with the Scheme.

35.     The Scheme recognizes four different types of Scheme Creditors: (i) Scheme Creditors (other than the Subordinated Creditor) with claims that cannot give rise to a contractual rate of interest greater than 8% per annum (the "8% Interest Claims," and the

---

[13] The imposition of the Bar Date is key to establishing the universe of creditors entitled to share in the Surplus, which then facilitates the payment of Statutory Interest to those who have proved their claims prior to the Bar Date.   In the absence of the Bar Date, Scheme Creditors would be exposed to the risk of new claims being admitted which could decrease the amount payable to them. The Bar Date is proposed to be the effective date of the Scheme (the "Effective Date").   If the Scheme becomes effective, all claims (other than certain claims not affected by the Scheme and certain future or contingent expense claims) will need to be proved for (or in the case of Non-Provable Claims and expense claims, notified to the Debtor) by this date.   Scheme Creditors failing to do so will not be entitled to assert such claims.

Scheme Creditors holding such claims, the "8% Creditors"); (ii) Scheme Creditors with claims under contracts that entitle them to a specified fixed or floating rate of interest that results in an entitlement to Statutory Interest greater than 8% (the "Specified Interest Claims," and the Scheme Creditors holding such claims, the "Specified Interest Creditors")[14]; (iii) Scheme Creditors with claims under 1992 or 2002 ISDA Master Agreements, or certain French Master Agreements (as defined in the Scheme), which give rise to a right to Statutory Interest calculated by reference to costs specific to the particular party as opposed to a fixed or floating rate (the "Higher Rate Claims," and the Scheme Creditors holding such claims, the "Higher Rate Creditors"); and (iv) the Subordinated Creditor.  As stated above, the SCG will vote in a separate class than other Scheme Creditors in respect of 8% Interest Claims, Specified Interest Claims and Higher Rate Claims that they hold in light of the Arrangement.

36.    The Scheme Creditors do not include (i) creditors who do not have a Provable Claim, but do have either (a) claims which are payable as expenses of the Administration (the "Expense Claims") or (b) claims that are not provable in the Administration, which are also not Expense Claims, but are payable from the Surplus, (ii) employees of the Debtor who are domiciled in a European Union member state other than the United Kingdom and who have not submitted a proof of claim in the Administration prior to the Bar Date, (iii) creditors with a contractual claim under a contract that is exclusively governed by a jurisdiction in a European Union member state other than the United Kingdom and who have not submitted a proof of claim in the Administration prior to the Bar Date, (iv) LBHI2, as a shareholder of the Debtor

---

[14] Currently, the only contract known to the Administrators that gives rise to a Specified Interest Claim is owned by LBHI.

and (v) a creditor named Storm Funding Limited that has a Provable Claim in the Administration.

**D.      Key Elements of the Scheme**

   *i.      Entitlements to Interest Under the Scheme*

37.      The Scheme provides for distributions to Scheme Creditors that are consistent with the existing judgments in the Waterfall Proceedings.  Specifically:

- 8% Creditors will receive payment of Statutory Interest at a rate of 8% per annum on the principal amount of their Provable Claim, calculated from the Administration Date to the date when the principal amount of such 8% Interest Claim is paid in full, with such calculation being done in accordance with the Relevant Principles (as defined below);

- Specified Interest Creditors will receive payment of Statutory Interest at the interest rate specified in the contract under which the claim arises, calculated from the Administration Date to the date when the principal amount of such Specified Interest Claim is paid in full, with such calculation being done in accordance with the Relevant Principles and

- Higher Rate Creditors will elect either to:

  - receive a payment in full and final settlement of their Statutory Interest entitlements calculated by applying a simple rate of 8% per annum (calculated in the same manner as 8% Interest Claims) plus an additional settlement payment of 2.5% of the value of their Admitted Claims in consideration for electing not to pursue the Certification Option described below (the "Settlement Payment Option"); or

  - submit a certification for the rate and amount of interest applicable to their Higher Rate Claims (the "Certification Option").  Such certification should be made, to the extent relevant, in accordance with (i) the judgments in Tranche A and Tranche C of the Waterfall II Proceedings, (ii) the agreed position in relation to certain French Master Agreements (as defined in the Scheme) and (iii) the principle that a contractual compounding rate of interest continues to compound on claims that have been paid in part by interim dividends until the principal amount of such claims has been paid in full (collectively, the "Relevant Principles").  Where a holder of a Higher Rate Claim elects the Certification Option,

it will receive a payment in respect of its Statutory Interest entitlements consistent with one of the following:

- the rate(s) and amount of interest specified in its certification, where such rate(s) and amount is agreed to by the Debtor or where (in the absence of an agreement between the parties) that rate(s) and amount is approved by an independent adjudicator (the "Adjudicator") pursuant to the Dispute Resolution Procedure set forth in the Scheme and described more fully below (the "Dispute Resolution Procedure");

- the rate(s) and amount counteroffered by the Debtor, where such rate(s) and amount are agreed to by the relevant Higher Rate Creditor or where (in the absence of an agreement) the relevant rate(s) and amount is approved pursuant to the Dispute Resolution Procedure; or

- payment of interest at the statutory minimum rate (8%) in circumstances where a certification is rejected by the Debtor and either such rejection is not appealed pursuant to the Dispute Resolution Procedure or an appeal of such rejection is unsuccessful.

38.    If a Higher Rate Creditor does not elect the Settlement Payment Option or the Certification Option within the deadline specified in the Scheme, the Higher Rate Creditor will be deemed to have elected the Settlement Payment Option.  A Higher Rate Creditor is required to make the same election in respect of all of its Higher Rate Claims; it cannot elect the Settlement Payment Option for some of its Higher Rate Claims and the Certification Option for other Higher Rate Claims.  In no event will a Higher Rate Creditor receive (a) less than the minimum Statutory Interest of 8% per annum (subject to applicable cost deductions) or (b) in the event the Higher Rate Creditor elects the Certification Option, the 2.5% settlement payment. Pursuant to the Lock-Up Agreement, the Wentworth Group and the SCG have agreed to accept the Settlement Payment Option in respect of all of their Higher Rate Claims.

39.     No payments of Statutory Interest will be made in respect of the Subordinated Debt unless and until (i) all possible claims that are senior are either paid or reserved for in full and (ii) the principal amount of the Subordinated Debt has been paid.

### ii.      Distributions to Scheme Creditors

40.     The Administrators anticipate making payments on account of the 8% Interest Claims, the Specified Interest Claims and the Higher Rate Claims (where such Higher Rate Creditor has elected the Settlement Payment Option) within 20 business days after the Administrators have determined that there are sufficient funds available (after reserving for all claims that may be proved or payable in priority to, or *pari passu* with, such claims, including Higher Rate Claims in respect of which the Certification Option has been elected).  Payments to Higher Rate Creditors that elect the Certification Option will be made within 20 business days after the applicable rate has been determined in accordance with the Dispute Resolution Procedure, provided the Debtor has sufficient funds to make such payments.  All payments to Scheme Creditors are subject to the Administrators' receipt of payment instructions and KYC information.

### iii.      Dispute Resolution Procedure

41.     The Debtor will appoint the Adjudicator in the Dispute Resolution Procedure to resolve disputes in relation to certifications made by Higher Rate Creditors.  The Debtor will use reasonable efforts to appoint (in order of priority) Sir Bernard Rix, Michael Brindle Queens Counsel ("QC") or Tim Howe QC as the Adjudicator.  If those individuals are not able to accept the appointment, then another suitably qualified candidate (such as another former judge or English law qualified QC) will be appointed in consultation with the Subordinated Creditor.

42.    In reaching his or her decision, the Adjudicator will consider, without an oral hearing, the material submitted by the parties.  The Adjudicator will act as an expert and not an arbitrator for these purposes.  The Adjudicator may (but is not obligated to) appoint a support team to assist his or her review of the materials presented.

43.    Consistent with the terms of the Scheme, the Adjudicator must (except in certain very limited circumstances – such as where there has been a mathematical or numerical error in either party's submission, in which case he or she may correct it) either uphold the case of the Higher Rate Creditor in its entirety or uphold the Debtor's case in its entirety.  The Administrators consider this to be an appropriate approach on the basis that (i) it allows for the certification process to be dealt with quickly and efficiently and (ii) it encourages all parties to propose figures that are reasonable in the first instance, rather than figures that are speculative and submitted on the basis that the Adjudicator will seek to find a "middle ground."

44.    In terms of determining which party's submission to accept, the Adjudicator will only be permitted to uphold the Debtor's case if he or she is satisfied on the balance of probabilities that the certification of the Higher Rate Creditor has been made in bad faith, irrationally or, without justification, other than in accordance with the Relevant Principles.  If the Debtor does not satisfy this burden of proof, then the Adjudicator must uphold the Higher Rate Creditor's case (corrected for any mathematical or numerical errors, as applicable).

45.    Any decision by the Adjudicator will be final and binding on the Debtor, the Administrators, the Higher Rate Creditor and all other parties to the Scheme.  The Adjudicator's decision can only be revisited in very limited circumstances (such as a clerical error, miscalculation or mistake made by the Adjudicator and that issue is brought to the Adjudicator's attention within ten business days of the decision being issued).

46.     If the Adjudicator finds in favor of the Higher Rate Creditor, then the Debtor will bear, as an expense of the Administration (i) its own costs, (ii) the reasonable legal costs of the Higher Rate Creditor incurred in connection with the Dispute Resolution Procedure (on an indemnity basis) and (iii) the fees, costs and expenses (inclusive of any VAT) of the Adjudicator and his or her support team.  If the Adjudicator finds in favor of the Debtor, then the Higher Rate Creditor will bear (i) its own costs, (ii) the reasonable legal costs of the Debtor incurred in connection with the Dispute Resolution Procedure (on an indemnity basis) and (iii) the fees, costs and expenses (inclusive of any VAT) of the Adjudicator and his or her support team.

### iv.    *Scheme Releases*

47.     The Scheme provides for certain releases to be given by all Scheme Creditors, including:

- a full release of all rights in respect of the Waterfall Proceedings, the Olivant Application, the Lacuna Application and any other proceedings (other than certain excluded proceedings) which have been formally commenced against the Debtor on or prior to the Bar Date (including any right to seek to put the Debtor into liquidation before statutory interest has been paid in full or otherwise provided for);

- a full release of all rights or claims against the Debtor (excluding those claims notified to the Debtor prior to the Bar Date and certain other Retained Claims (as defined in the Scheme));

- a full release of all rights to require any future liquidator to bring contributory proceedings under applicable English insolvency law (to provide finality regarding the scope of the assets to be distributed);

- a full release by all Scheme Creditors of any right to bring actions or disputes in the future in respect of: (i) their Admitted Claims; and (ii) the Admitted Claims of any other Scheme Creditor that were admitted by the Administrators prior to the Record Date (as defined in the Scheme) and

- a full release (to the extent permitted by law) of any right to appeal first instance decisions (subject to certain exceptions) of any court of competent jurisdiction

which relate to an exercise of the Administrators' powers or functions after the Effective Date, including an application by the Administrators to the High Court for directions or an appeal by a creditor to the High Court against the Administrators' decision in relation to a proof of debt.

48.     In addition, each Scheme Creditor will provide a full release of:

- any claim against the Administrators, their firm and their advisors and certain other connected parties, arising from actions taken between the commencement of the Administration and the Bar Date and in respect of which the relevant person would have an indemnity or similar claim against the Debtor; and

- any claim against the Administrators, their firm, the parties to the Lock-Up Agreement and their respective advisors and certain other connected parties, arising from actions taken on or after November 1, 2017 with respect to the promotion or implementation of the Scheme (but not including (i) claims for breach of a term of the Scheme or (ii) certain claims between parties to the Lock-Up Agreement).

### *v.     Role of the Subordinated Creditor*

49.     The Wentworth Group's agreement to sign the Lock-Up Agreement and support the Scheme was conditioned on the Administrators' agreement to grant the Subordinated Creditor consultation rights with respect to the determination of matters likely to impact its ultimate recovery in respect of the Subordinated Debt.  To facilitate the Subordinated Creditor's involvement, the Scheme provides that the Debtor must engage with the Subordinated Creditor with respect to various matters, including:

- the right to be consulted in relation to the Debtor's decision on whether or not to accept a certification in relation to a Higher Rate Claim, although discretion as to whether or not to accept any certification ultimately rests with the Debtor);

- determining any counteroffer made to a certifying Higher Rate Creditor (the Debtor must consult with the Subordinated Creditor to determine the counteroffer and, if agreement cannot be reached, make a counteroffer at the level proposed by the Subordinated Creditor);

- the appointment of an alternative Adjudicator in the event that none of the three individuals named in paragraph 41 above are able to accept the appointment (but

the final decision as to the appointment of the Adjudicator rests with the Debtor if agreement cannot be reached); and

- the approval of the Administrators' remuneration after it becomes clear that there are sufficient funds for a payment to be made in respect of the Subordinated Debt.

50.     The Administrators are content to afford such rights to the Subordinated Creditor as part of the overall set of compromises reached given (i) the potential economic impact upon the Subordinated Creditor and (ii) that the Wentworth Group would not have supported the Scheme if it did not provide such rights to the Subordinated Creditor.

### vi.     *Classification and Voting*

51.     For purposes of organizing the Scheme Meetings, the Debtor proposes to have the following four classes: (i) 8% Creditors and Specified Interest Creditors (other than the SCG); (ii) Higher Rate Creditors (other than the SCG); (iii) the SCG; and (iv) the Subordinated Creditor.  For each class, there will be a separate Scheme Meeting at which Scheme Creditors will consider approval of the Scheme.  With the exception of the SCG, Scheme Creditors falling into multiple classes will be able to vote in respect of their 8% Interest Claims and Specified Interest Claims at the applicable meeting convened for the 8% Creditors and the Specified Interest Creditors and in respect of their Higher Rate Claims at the meeting convened for the Higher Rate Creditors.  Since the SCG is in a separate class, the SCG will vote at a single meeting in respect of their 8% Interest Claims, Specified Interest Claims and Higher Rate Claims.  To the extent Scheme Creditors hold multiple claims in a particular class, they must vote all of those claims in the same class in the same manner.  To the extent Scheme Creditors hold multiple claims in multiple classes, they may vote their claims held in each class differently.  It is anticipated that the Scheme Meetings will be held at Linklaters' London office on June 5, 2018 and that I will act as chairman of the Scheme Meetings.

### vii.    *Implementation of the Scheme*

52.    The proposed timetable for the implementation of the Scheme is as follows:

- May 14, 2018: All known Scheme Creditors will be provided with copies of relevant documentation, including the Debtor's determination of their voting rights in relation to the Scheme;

- June 5, 2018: Scheme Meetings will be held.

- June 8, 2018: The Debtor will file with the High Court a copy of the chairman's report of the Scheme Meetings.

- June 13, 2018: Subject to approval by the requisite majority of Scheme Creditors at the Scheme Meeting, a hearing will be held to determine whether the Scheme should be sanctioned.

- If the Scheme is sanctioned, it is anticipated that the Scheme will become effective shortly thereafter.

53.    The Administrators and I believe that the proposed timetable is reasonable and allows Scheme Creditors sufficient time to consider the terms of the Scheme, to vote on the Scheme and to carry out any other necessary steps in relation to the Scheme.

### viii.    *Consequences of the Scheme*

54.    If the Scheme is approved by the Scheme Creditors, in addition to making distributions in respect of Statutory Interest entitlements of 8% Creditors, Specified Interest Creditors and Higher Rate Creditors and a payment to the Subordinated Creditor, the Scheme may also make way for potential payments to LBHI2 in its capacity as the Debtor's shareholder (but those payments will only be made to the extent that all possible claims that rank in priority are either paid, or reserved for, in full).  To the extent that the Debtor goes into an insolvent liquidation however (contrary to the Administrators' current expectation and intention), it is intended that the provisions of the Scheme will prevail to the extent that the law allows and that

any amounts payable in respect of distributions under the Scheme will not be reduced or otherwise affected.

55.    I believe that the Scheme is in the best interests of the Scheme Creditors. The Scheme represents a fair outcome for all Scheme Creditors because it will (i) facilitate earlier payments of Statutory Interest entitlements, (ii) avoid the risk of Scheme Creditors' entitlements becoming worthless if they are not paid prior to the Debtor going into liquidation, (iii) provide certainty that interest on all Provable Claims in the Administration will be calculated from the Administration Date, (iv) avoid the risk of Admitted Claims being challenged and (v) reduce the risk that there will be insufficient funds to make a full payment of Statutory Interest entitlements.

56.    If the Scheme is not approved, then the Scheme Creditors as a whole are likely to be disadvantaged because (i) uncertainty regarding the Scheme Creditors' entitlements to Statutory Interest would remain, (ii) the continuation of the Waterfall II Proceedings, Lacuna Application and Olivant Application would result in additional costs for the Administration and delay distributions from the Surplus, (iii) some Scheme Creditors' claims might be challenged or reduced, (iv) were the Debtor to enter into liquidation, the Scheme Creditors' rights to unpaid Statutory Interest would be lost and (v) due to the lack of a bar date, the Scheme Creditors would be exposed to the risk of new claims being received which, if of sufficient number, could decrease the amount payable to the Scheme Creditors with Admitted Claims.

E.    **Continuation of the Administration**

57.    Following the Effective Date of the Scheme, the Debtor will remain in administration, and the Administrators will make the distributions to Scheme Creditors under the Scheme. On November 4, 2016, the Administration was extended by the High Court to

November 30, 2022. The Scheme will not resolve all remaining issues in the Administration.

For example, the Scheme will not impact any trust entitlement of a Scheme Creditor.[15]

## V.        The Debtor's Headquarters and Connections to the United States

58.       Prior to the Administration, the Debtor was the main European broker-dealer in the Lehman Group based out of the Lehman Group's regional headquarters in London, England, where the Debtor continues to maintain its registered office. Since the commencement of the Administration, the Debtor has been, and continues to be, managed and controlled by the Administrators, each of whom is located in London, England and supervised by the High Court. Over the past ten years, the Administrators have been responsible for marshalling and liquidating the Debtor's assets, reconciling and admitting claims asserted against the Debtor and determining distributions to be made to those creditors. The Administrators are also responsible for all strategic and other decisions on behalf of the Debtor. To perform these functions, the Debtor maintains headquarters in London, England where employees of the Debtor and the Administrators' firm assist the Administrators in fulfilling these responsibilities. All key activities relating to the Debtor, including meetings of the Administrators, typically occur either at the Debtor's headquarters in London, PwC's office in Leeds, England or at PwC's London offices, where the Administrators maintain offices. The periodic progress reports that update the Debtor's creditors with respect to matters affecting the Debtor are prepared by the Administrators in England and state that the Debtor's registered office is located in London, England. Other public filings made by, and correspondence from, the

---

[15] Prior to the Administration, the Debtor held, in the course of its prime brokerage, custody and other businesses, securities and cash (the "<u>Trust Property</u>") in trust for its clients and other affiliates (the "<u>Trust Property Creditors</u>"). While such trust entitlements will not be released by the Scheme, the Scheme will release any unsecured claim of a Trust Property Creditor if such a claim is not proved before the Bar Date.

Debtor, typically note that the Debtor is an English company and has a registered office in England. All of the Debtor's employees are located in England.

59.     While the Debtor's headquarters are located in England, the Debtor also has substantial connections to the United States. The Debtor is a party to over 300 ISDA Master Agreements and other contracts that are governed by New York law and contain New York forum selection clauses. The Debtor has the following assets located in the United States: (i) securities evidenced by physical certificates issued by a U.S. entity that are held by a custodian in New York; (ii) a judgment issued by a New York state court against a non-U.S. entity in the amount of approximately $230 million; (iii) allowed claims in the aggregate amount of approximately $2 billion in the chapter 11 cases of Lehman Brothers Holdings Inc. and its affiliates; (iv) a residual $1 million claim in the LBI SIPA proceeding; and (v) a $50,000 evergreen retainer with the New York office of Linklaters LLP being held in a client trust account located in New York. The Debtor is also the plaintiff in a lawsuit against AG Financial Products, Inc. that is pending before the Supreme Court of the State of New York pursuant to which the Debtor seeks a judgment against the defendant in connection with the early termination of 28 credit derivative transactions on the grounds of the Debtor's Administration (the "AG Financial Products Litigation").[16]

## VI.     Need for Chapter 15 Relief

60.     The English Proceeding, the Scheme and the Sanction Order comport with English law and, I am advised by U.S. counsel, satisfy the requirements for recognition and enforcement under chapter 15 of the Bankruptcy Code. Recognition of the English Proceeding,

---

[16] The case is *Lehman Brothers International Europe (in administration) vs. AG Financial Products, Inc.*, Index No. 653284/2011, pending in the Supreme Court of the State of New York, County of New York.

enforcement of the Scheme and the Sanction Order within the territorial jurisdiction of the United States and approval of the Injunction are critical components in a series of steps required to implement the Scheme without disruption or the threat of adverse actions by dissenting creditors against the Debtor or its assets in the United States. Without assistance from this Court, the Scheme and the Sanction Order could be fundamentally undermined to the detriment of all parties in interest. I believe that the interests of all Scheme Creditors are aligned with the Debtor in obtaining recognition of the English Proceeding, enforcement of the Scheme and the Sanction Order within the territorial jurisdiction of the United States and approval of the Injunction to ensure that the Scheme is implemented successfully.

61.     I have also requested that the Court cause the Proposed Order to become effective immediately upon entry notwithstanding the 14-day stay of effectiveness of that order. I believe that a waiver of the 14-day stay of effectiveness period is appropriate in these circumstances to allow the Debtor to proceed immediately with the implementation of the Scheme in accordance with the timetable set forth in the Lock-Up Agreement.

**VII.**      **Conclusion**

62.     In conclusion, for the reasons stated herein and in the Petition, I respectfully request that the Petition for recognition of the English Proceeding as a foreign main proceeding and for related relief be granted in its entirety, together with such other and further relief as this Court deems just and proper.

*[Signature Page Follows]*

I certify under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  May 14, 2018


/s/ *Russell Downs*
Russell Downs
Joint Administrator